UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:11-CR-27 |
| ) | |
| PAUL PRATER ) | |

**REPORT AND RECOMMENDATION**

The defendant has filed a motion to suppress evidence of the ammunition discovered and seized from the vehicle he was driving during the course of a traffic stop on Interstate 81 in Sullivan County on March 17, 2011. (Doc. 41). A hearing was held on February 17, 2012.

The government's proof consisted of testimony of Tennessee State Trooper Robert Greer, who effectuated the traffic stop, and Agent Ted Francisco of the Department of Homeland Security. The relevant facts are as follows:

Agent Francisco, who is assigned to East Tennessee, was contacted by fellow agents in New York regarding information they had uncovered while performing an investigation there. The individual they were investigating had an accomplice in East Tennessee who was apparently transporting large quantities of ammunition from East Tennessee to New York. They knew that the first name of the suspect in Tennessee was "Paul." The New York agents advised Agent Francisco that as they developed more details, they would request his help in interdicting "Paul."

Based upon information they had gained from a wiretap on the suspect in New York,

the agents there subsequently provided other information to Agent Francisco. From listening to several phone calls, they ascertained that the Tennessee suspect was Paul Prater, the defendant herein, and that he had an extensive felony record. They later advised him, based upon an intercepted phone call between the New York suspect and the defendant, that defendant was to receive a package from the New York suspect in Jefferson City, Tennessee. Agent Francisco's office set up surveillance and observed defendant pick up the package. They noted his vehicle, a maroon Chevrolet Monte Carlo, and set up surveillance at the defendant's residence.

On March 16, 2011, the surveillance team observed the defendant and a female named Williams, ultimately learned to be the owner of the Monte Carlo, travel to the Dixie Pawn Shop in Jefferson City. While they were in the shop, the New York agents relayed to Agent Francisco that a telephone call was then taking place between Mr. Prater and the New York suspect regarding the precise ammunition he was purchasing at the pawn shop, and that he was going to leave to deliver it to New York the next day. The Tennessee surveillance team then observed defendant and Ms. Williams exit the pawn shop with a duffel bag which the agents could tell contained something heavy. Defendant and Williams then returned to the residence for the night.

Agent Francisco and his superiors had been in contact with the Tennessee Highway Patrol regarding obtaining their potential assistance in effecting a traffic stop, based upon probable cause of a traffic violation, of Mr. Prater and the Monte Carlo as he was transporting the ammunition on Interstate 81 through Sullivan County, Tennessee on his way to his associate in New York. Of course, the agents could have confronted and arrested

defendant as he exited the Dixie Pawn Shop, but to have done so would have immediately and irrevocably compromised the on-going investigation in New York. Sgt. Greg Roberts, a coordinator with the THP's Criminal Interdiction Unit, to which Trooper Greer is assigned, contacted Trooper Greer on March 16th asking him to report for work early to attempt to make a probable cause traffic stop on Mr. Prater as he traveled towards New York. Sgt. Roberts asked Greer to report for duty at 6:00 a.m. on March 17th. Trooper Greer was aware of the defendant's name, criminal record, and the make, model and tag number of the Monte Carlo. He was also aware that the Homeland Security agents strongly desired that any information regarding the investigation in New York be withheld from the defendant when the stop was conducted.

At around 6:00 a.m. on the 17th, the Homeland Security agents surveilling defendant's residence observed him loading the duffel bag and items of luggage into the Monte Carlo. Defendant and Ms. Williams then got in the car and proceeded to Interstate 81 where they traveled north towards Sullivan County, where Trooper Greer was waiting. The surveilling agents stayed in contact with Trooper Greer or his supervisor regarding defendant's progress towards Trooper Greer's location. Defendant made a stop at Exit 30, and another one at Exit 36. The surveilling agents lost sight of his vehicle for a short time at Exit 36, but subsequently relocated it pulling out of a convenience store and resuming the journey north on the interstate. All of this information was relayed to the Highway Patrol and was known by Trooper Greer.

Trooper Greer positioned himself just south of the 55 mile marker on the northbound shoulder of Interstate 81. Trooper Greer's cruiser is equipped with radar, both in the back

3

window and the front windshield. The radar is calibrated annually and it was well within its period of certification as performing accurately and normally. Also, Trooper Greer was certified as a radar specialist, which involves visually estimating the speed of a vehicle and comparing that estimate with the radar reading. His estimate has to be within 5 miles of the speed indicated by the radar unit, and he must annually be tested and get "10 out of 10" to be certified. His certification was current.

Trooper Greer observed defendant coming around a curve behind him and down the hill, passing other traffic. The speed limit at that point is 65 miles per hour for cars. Trooper Greer estimated the defendant's speed to be well in excess of the 65 mile per hour limit, and the radar confirmed that defendant's vehicle was traveling at 74 miles per hour.[1]

Trooper Greer activated his blue lights and began following the Monte Carlo. Defendant pulled over shortly thereafter. Trooper Greer approached the vehicle and, after advising the defendant that he had been stopped for speeding, asked him to come back to the cruiser with his license and other required documents. Defendant came back to the cruiser and gave him *Ms. Williams'* drivers license. Defendant advised that he didn't have one himself. Trooper Greer already knew from a check of the Tennessee drivers license database that defendant did not have a Tennessee license. Defendant said that he had been licensed in New York. Trooper Greer checked with the appropriate database which indicated that defendant's New York license had been revoked. Trooper Greer then placed the defendant under arrest and went to speak with Ms. Williams.

---

[1]On cross examination, defendant asked Trooper Greer if the radar could have picked up the speed of one of the other vehicles. Since defendant was *passing* the other vehicles, even if the radar picked up one of them, plaintiff necessarily would have been speeding.
4

Case 2:11-cr-00027-RLJ-MCLC   Document 58   Filed 02/17/12   Page 4 of 7   PageID #: 161

He learned that the vehicle was registered to Ms. Williams and he asked for permission to search the vehicle. She granted permission and executed a form giving him permission to search. The search revealed around 500 rounds of ammunition of various calibers. Ms. Williams then signed an inventory form surrendering the ammunition to Trooper Greer. After being advised of his *Miranda* warnings, defendant told Trooper Greer that he was taking the ammunition to New York but refused to say to whom he was taking it. Ms. Williams advised that the ammunition was for her uncle in New York.[2]

There were two bases to stop the vehicle defendant was driving, either of which is equally valid. First, Agent Francisco knew the defendant was a convicted felon. He also knew that defendant had purchased a sizable quantity of ammunition from the Dixie Pawn Shop which he had placed in a duffle bag. He saw defendant place that same duffle bag in his vehicle on the morning of March 17. Agent Francisco, or other agents with whom he was then working, maintained surveillance on Mr. Prater as he drove northbound on Interstate 81. Knowing that defendant was a convicted felon and that he was then in possession of ammunition, at the very least there was a reasonable suspicion, based on articulable facts, that would have supported a *Terry-stop*. *See, Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Williams*, 962 F.2d 1218, 1223-24 (6th Cir.) cert. denied, 506 U.S. 892 (1992). If the traffic stop had been an investigative *Terry-stop*, all would have transpired exactly as it did: Trooper Greer would have asked for defendant's drivers license; he would have discovered defendant had no drivers license; he would have arrested defendant for that offense; he would

---

[2] At various points during the stop, Trooper Greer communicated with Agent Francisco regarding what was going on, and after the Trooper advised him that the ammunition had been found, Francisco and other agents came to the scene of the stop.

5

asked for and received permission from Ms. Williams to search the car; and the ammunition would have been discovered.

The second valid basis for the traffic stop, and the one actually utilized, was the defendant's excessive speed. The fact that Trooper Greer fully intended to "interdict" defendant and stop his vehicle for a traffic offense is irrelevant so long as the Trooper had probable cause that a traffic offense in fact occurred. *See, Whren v. United States*, 517 U.S. 806 (1996); *Arkansas v. Sullivan*, 532 U.S. 769 (2001); *United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993). Not only did Trooper Greer have probable cause to believe that a traffic offense had occurred, he *knew* that it had. He immediately recognized that defendant was exceeding the speed limit, and his subsequent use of the radar unit so confirmed. The fact that the stop for a traffic violation was pretextural is irrelevant.

Once Trooper Greer stopped the vehicle for its excessive speed, he obviously was entitled to ask for the driver to exhibit his drivers license. As noted, defendant's New York drivers license had been revoked. As a result, defendant was appropriately arrested.

Ms. Williams, as owner of the vehicle, had authority to consent to the vehicle's search. *See, e.g., United States v. French*, 974 F.2d 687 (6th Cir. 1992). A consent to search a vehicle entails a consent to search every container within the car. Further, it is noted that the written consent to search executed by Ms. Williams explicitly included her authorization to search the contents of the vehicle.

In conclusion, Trooper Greer had probable cause to believe that defendant was exceeding the speed limit, as a result of which the Trooper's traffic stop was valid. Defendant's arrest was based on probable cause that he was driving a vehicle

notwithstanding his drivers license was revoked. Ms. Williams, as the registered owner of the vehicle, had authority to consent to the search of her vehicle and all containers within it. That search revealed the ammunition.

Lastly, after being warned of his constitutional right to remain silent, defendant admitted purchasing and transporting the ammunition.

There is no basis to suppress any evidence of the ammunition, and it is respectfully recommended that the defendant's motion to suppress be denied.[3]

Respectfully submitted,

    s/ Dennis H. Inman    
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).

7

Case 2:11-cr-00027-RLJ-MCLC   Document 58   Filed 02/17/12   Page 7 of 7   PageID #: 164